## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Dennis Elbert, depose and state as follows:

## AGENT BACKGROUND

1.      I am a police detective employed by the Dover, New Hampshire, Police Department, where I have been employed since April 2019. I am currently assigned full time to the Federal Bureau of Investigation's ("FBI") New Hampshire Major Offender Task Force ("NHMOTF") as a task force officer, where I am tasked with investigating violent criminals, gang members, and significant drug traffickers throughout the state. As part of the NHMOTF, I work alongside law enforcement officers from various local, state, and federal agencies throughout the State of New Hampshire.

2.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

3.      Throughout my career, I have led and/or been involved with investigations of robberies, theft related crimes, fraud related crimes, assaults, criminal threatening, domestic violence, drug distribution, illegal possession of firearms, and other crimes. My investigations have included the use of the following investigative techniques: physical surveillance; handling of cooperating sources and witnesses; exploitation of cellular, social media, and Internet Protocol ("IP") based communications data; execution of search and seizure warrants; wire, electronic, and oral wiretaps; and the execution of arrest warrants.

1

4.      Based on my training, experience, and information provided to me by other law enforcement officers, I am familiar with the modus operandi used by individuals engaged in the violation of various criminal offenses, such as those related to acts of violence, firearms, and controlled substances. For example, I have handled many cooperating sources and witnesses who have provided information to me specifically related to the distribution of controlled substances. I have also reviewed court-authorized wiretap intercepts between drug traffickers and individuals engaged in the violation of other offenses. Many of these investigations have resulted in the execution of search warrants, arrest warrants, and eventual convictions.

## PURPOSE OF AFFIDAVIT

5.      I submit this affidavit in support of an application for a warrant to search a shed located on the premises of 18 Copeland Drive, Rochester, New Hampshire, associated with Apartment A.

6.      On November 1, 2023, United States Magistrate Judge Andrea Johnstone issued four warrants to search Target Premises #1, Target Premises #2, Target Vehicle #1, and Target Vehicle # 2 as identified here:

    a.      18 Copeland Dr, Apartment A, Rochester, New Hampshire (hereafter, the "**Target Premises 1**").

    b.      Rochester Residence Inn, room #9, 182 Milton Rd, Rochester, New Hampshire (hereafter, the "**Target Premises 2**").

    c.      Black 2019 BMW X3, NH registration 5085322, registered to HALEY M CAHILL (hereafter, the "**Target Vehicle 1**").

    d.      Gray 2017 Infiniti Q70L, MA registration 3MCJ67, registered to MONTY P GRANGER (hereafter, the "**Target Vehicle 2**").

*See* 23-mj-199-01-AJ, 23-mj-198-01-AJ, 23-mj-197-01-AJ, and 23-mj-196-01-AJ.

7.      Based on the information contained herein, there is probable cause to believe that the shed located on the property of 18 Copeland Drive in Rochester, New Hampshire, associated with Unit A, as described in Attachment A, contains evidence, fruits, and instrumentalities as

further described in Attachment B of the crimes of 21 U.S.C. § 841(a)(1) and 846 [Distribution of and Possession with Intent to Distribute Controlled Substances, and Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances ("the Target Offenses")].

8.      The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers. I have not set forth every detail I or other law enforcement officers know about this investigation but have set forth facts that I believe are sufficient to evaluate probable cause as it relates to the issuance of the requested warrant.

## BACKGROUND

9.       Over the past year, law enforcement officials have identified **MONTY PAUL GRANGER** (herein referred to as "GRANGER"), **HALEY M. CAHILL** (herein referred to as "CAHILL"), and **FELIX URRUTIA** (herein referred to as "URRUTIA") as significant narcotics distributors in the Rochester, Somersworth, and Dover, New Hampshire areas. Based on information obtained from open internet sources, CAHILL and GRANGER are romantic partners, and the two of them live together in an apartment of a duplex style apartment building, located at 18 Copeland Dr, Apartment A, Rochester, New Hampshire (Target Premises #1). GRANGER and CAHILL also have a young child in common.   Sources of information have also informed law enforcement agents that GRANGER was armed and was known to be violent.

10.      Additionally, URRUTIA is known to stay at various local motels for temporary durations of time. Based on observations and the controlled purchases outlined below, law enforcement is aware that URRUTIA is presently staying at Target Premises 2.

**INFORMATION REGARDING CW-1 AND CW-2**

11.     In October 2022, members of the NHMOTF developed a Cooperating Witness (herein referred to as "CW-1") who stated that he/she had purchased drugs from URRUTIA and was able to continue to do so as part of CW-1's cooperation. CW-1 originally agreed to cooperate with law enforcement in exchange for consideration towards pending New Hampshire state level criminal charges for narcotics possession and motor vehicle charge.  As a result of their cooperation, CW-1's narcotics charge was never formally charged in court.  CW-1 resolved the motor vehicle charge with a plea.  Over the course of the investigation, CW-1 was proven to be reliable and credible. Therefore, CW-1 eventually transitioned to cooperating with law enforcement in exchange for financial compensation. CW's criminal history includes convictions for the following (all of which were New Hampshire state offenses): Theft by Deception (02/02/2000), Forgery (01/30/1996), and Driving While Impaired (05/20/2005, 12/23/2014, 05/28/2021).

12.     In September 2023, members of the NHMOTF developed another Cooperating Witness (herein referred to as "CW-2"), who stated that he/she had purchased drugs from GRANGER and was able to continue to do so as part of CW-2's cooperation. CW-2 agreed to cooperate with law enforcement in exchange for consideration towards pending New Hampshire state level criminal charges related to narcotics possession as well as driving charges.  As a result of their cooperation, CW-2's driving and narcotics offenses were not formally charged in court. CW-2's criminal history includes convictions for the following (all of which were New Hampshire state offenses): Receiving Stolen Property (12/18/1990), Resisting Arrest or Detention (05/31/1991), Aggravated Driving While Intoxicated (11/20/2018), and Fraudulent Use of Credit Card (09/21/2020).

13.     To date, various information provided by CW-1 and CW-2 has been corroborated by law enforcement. For example, CW-1 and CW-2 informed law enforcement that URRUTIA and GRANGER were narcotics distributors – a fact that was confirmed by both Cooperating Witnesses during controlled purchases described below. Historical information provided by the Cooperating Witnesses regarding other known traffickers has also proven to be accurate and corroborated by law enforcement knowledge. For these reasons, I believe CW-1 and CW-2 to be truthful and reliable with respects to the information and assistance provided to law enforcement in the investigation of URRUTIA, GRANGER, and CAHILL.

**PROBABLE CAUSE THAT EVIDENCE IS LOCATED
INSIDE THE TARGET PREMISES #1 AND THE SHED ASSOCIATED WITH IT**

14.     October 20, 2022 Buy:   On this date, NHMOTF investigators conducted a controlled purchase of suspected heroin/fentanyl from URRUTIA utilizing CW-1. At the direction of law enforcement, CW-1 had previously organized the purchase of approximately 40 grams of heroin/fentanyl from URRUTIA for $1000.00, which they did via phone calls to 603-923-0984. On this date, NHMOTF members met with CW-1 at a pre-determined location ("PDL"). At the onset of the meeting, CW-1 was searched for contraband, controlled substances, weapons, and unexplained currency – none were located. CW-1 was then equipped with a surreptitious audio and video recorder as well as an audio transmitter to utilize during the controlled purchase.

15.     At the direction of law enforcement, CW-1 attempted to place a recorded phone call to 603-923-0984 to reaffirm the upcoming drug transaction, but there was no answer. This was the only phone number that CW-1 used to communicate with URRUTIA, so CW-1 believed that URRUTIA may have run out of minutes. CW-1 was provided with $1000.00 in serialized currency of Official Agency Funds ("OAF"), and they subsequently deployed from the PDL on foot towards the Anchorage Inn. CW-1 was under direct surveillance as they walked up Wadleigh Road towards

URRUTIA's motel room. Once CW-1 went inside the motel room, CW-1 was heard over the audio transmitter speaking to a male voice. The GPS function of the audio transmitter showed CW-1 was located inside the motel. Wadleigh Road was an access roadway, with a single entrance and exit, that led to the parking lot of the Anchorage Inn motel. The only way to enter Wadleigh Road and reach the motel was from Columbus Avenue. Aside from the Anchorage Inn, Wadleigh Road did not access any other businesses or residences. Therefore, during this controlled purchase operation, investigators opted not to place surveillance units directly in the Anchorage Inn parking lot. Using motel guest records, investigators confirmed that URRUTIA's motel room number was 133.

16.     Shortly after, surveillance observed a black BMW entering Wadleigh Road from Columbus Avenue, and was seen continuing up the hill to the parking lot of the motel. Several minutes later, the black BMW was observed leaving the Anchorage Inn. Around this time, CW-1 was observed leaving the Anchorage Inn on foot until returning to the PDL where they reunited with the handling agents. CW-1 relinquished to the investigators four plastic baggies containing a loose tan powder-like substance, consistent with the appearance and packaging of heroin/fentanyl. CW-1 was again searched for contraband, weapons, controlled substances, and unexplained amounts of currency, with negative results.

17.     CW-1 and investigators debriefed how the controlled purchase transpired. CW-1 reported that they departed the PDL on foot, arrived to room #133 of the Anchorage Inn, and entered through the unlocked door to find URRUTIA standing by a table. URRUTIA told CW-1 that a girl was on the way with the drugs and that she lived locally. URRUTIA stated that she was bringing five "sticks,"[1] at which point CW-1 indicated they only had the money to buy four "sticks." URRUTIA became aggravated as there was apparent confusion on the agreed upon deal.

---

[1] A "stick" is a slang term for approximately 10 grams of heroin/fentanyl.

URRUTIA stated that the female supplier would be angry about not having the money for five "sticks." The female arrived shortly after, and CW-1 observed a dark colored BMW SUV arrive and park in front of URRUTIA'S room. URRUTIA told CW-1 to remain in the motel room. URRUTIA took CW-1's money and exited the motel room to approach the passenger door of the BMW. After approximately a minute, URRUTIA returned to the motel room and handed four plastic baggies of suspected heroin/fentanyl to CW-1. CW-1 then left on foot, walked down Wadleigh Road, and reunited with the handling agents.

18.     CW-1 reported that they were familiar with the female who had arrived to the drug transaction. CW-1 believed that the female's father was a former sheriff deputy with the Strafford County Sheriff's Office, and that the female had historically been imprisoned for a robbery charge. Based on this information, investigators believed the involved female party in the black BMW SUV was HALEY CAHILL. Strafford County Sheriff's Office confirmed that CAHILL's father was a retired member of the Strafford County Sheriff's Office. A review of CAHILL's criminal history confirmed that CAHILL had in fact been convicted of a Robbery – Weapon or Serious Bodily Injury Conspiracy charge in 2017 for which she was sentenced to confinement. Investigators also believed that URRUTIA and CAHILL were acquainted because of their involvement in a former romantic relationship according to historic Rochester Police contacts. Additionally, the vehicle that CW-1 described arriving to the location of the narcotics deal was the same vehicle registered to CAHILL, a black 2019 BMW X3 bearing New Hampshire registration 5085322, Target Vehicle #1, which was confirmed through the Department of Motor Vehicles records.

19.     The audio/video recording corroborated the events that CW-1 debriefed. Investigators were able to positively identify the male inside the motel room to be URRUTIA. The suspected heroin/fentanyl was later weighed to be approximately 44.0 grams unpackaged.[2]

20.     October 31, 2022 Buy: On this date, NHMOTF investigators utilized CW-1 to conduct a controlled purchase from Urrutia. At the direction of law enforcement, CW-1 organized another transaction with URRUTIA to purchase approximately 50 grams of heroin/fentanyl for $1250.00. CW-1 confirmed the transaction and informed investigators that URRUTIA obtained more minutes on his phone, again at the number 603-923-0984.

21.     Later this date, NHMOTF members met with CW-1 at a PDL. CW-1 was searched for contraband, controlled substances, weapons, and unexplained currency – none were located. CW-1 was then provided with a surreptitious audio and video recorder, an audio transmitter to utilize during the controlled purchase, and $1250.00 in serialized currency of OAF for the purchase. CW-1 showed to the investigators a text message sent to them by URRUTIA, from the phone number 603-923-0984, which read "I'm just waiting for them to get here." CW-1 received another text message from URRUTIA that read, "Shit they're gonna be here in three minutes." For this particular controlled purchase operation, surveillance units established a surveillance perimeter in the actual motel parking lot. Surveillance units then observed Target Vehicle #1, pulling up Wadleigh Road towards the Anchorage Inn. Target Vehicle #1 parked near motel room #133. Surveillance observed URRUTIA exit his motel room, walk to the passenger side of the vehicle, and enter. Prior to deploying from the PDL, URRUTIA texted CW-1 "Iam they here,"

---

[2] All of the suspected heroin/fentanyl and methamphetamine purchased during this investigation has been sent to Northeast DEA Laboratory for testing. Investigators have received the results for the July 27, 2023 transaction, September 20, 2023 transaction, and the October 3, 2023 transaction.

then followed up with another text "Now." CW-1 subsequently left the PDL on foot towards the Anchorage Inn under direct and uninterrupted surveillance.

22.     Surveillance units observed URRUTIA exit the passenger side of Target Vehicle #1 and return to his motel room. CW-1 arrived to Room 133 at the Anchorage Inn and went inside. Surveillance observed URRUTIA exiting his motel room again, and re-entering the passenger side of Target Vehicle #1. Shortly after, URRUTIA exited Target Vehicle #1 again and returned to his motel room. Target Vehicle #1 then left. While inside the motel room, CW-1 could be heard speaking to URRUTIA over the audio transmitter, and the GPS locator indicated that they were inside the motel.

23.     CW-1 exited URRUTIA's motel room and was observed by surveillance returning to the handling agents on foot until they were reunited at the PDL. CW-1 relinquished five plastic baggies containing a loose tan powder-like substance, consistent with the appearance and packaging of heroin/fentanyl. CW-1 was searched for contraband, controlled substances, weapons, and unexplained amounts of currency with negative findings.

24.     The handling agents debriefed CW-1 and were informed of the following. As CW-1 was approaching URRUTIA's motel room, they noticed the black SUV that they recognized to be the same vehicle from the last controlled purchase. CW-1 observed URRUTIA exit the vehicle and return to his room. CW-1 followed URRUTIA inside. Once inside the motel room, CW-1 counted the money out loud and placed it on a table. URRUTIA took the money, told CW-1 to wait inside, then exited his motel room and returned to the black vehicle. About a minute later, URRUTIA again returned to his motel room and handed CW-1 five plastic baggies containing the suspected heroin/fentanyl. CW-1 subsequently left the motel room and noticed the black vehicle was gone. CW-1 informed the investigators that the driver of the vehicle was a female, who

appeared skinny, pale, with black hair, and had multiple tattoos on both arms. This description corroborated the physical appearance of CAHILL, Target Vehicle #1's registered owner, based on her booking photograph and prior police contact. CW-1 stated that aside from this female, no one else was in the vehicle. CW-1 then added that this female always brought URRUTIA the "drugs."

25.    Investigators later reviewed the audio/video footage from the recording, and again positively identified the involved male completing the narcotics deal with CW-1 as URRUTIA. The recording also captured Target Vehicle #1 in the parking lot, CW-1 and URRUTIA counting the money, and the narcotics exchange between CW-1 and URRUTIA. The suspected heroin/fentanyl weighed approximately 57.7 grams unpackaged.

26.    Surveillance units continued their surveillance of Target Vehicle #1 immediately after it left the Anchorage Inn. Investigators positively identified the female driver as CAHILL. Surveillance units followed CAHILL and ultimately observed her arrive at Target Premises #1.

27.    July 27, 2023 Buy:   On this date, NHMOTF investigators conducted a controlled purchase of narcotics from URRUTIA, again utilizing CW-1. Since the last controlled purchase, URRUTIA had moved to the Riviera Motel, room #118, located at 479 Gonic Road, Rochester, New Hampshire. At the direction of law enforcement, CW-1 previously organized a narcotics transaction for the purchase of approximately one ounce of methamphetamine for $600. CW-1 organized this transaction with URRUTIA via text messages and phone calls, at a new phone number of 603-241-6118.

28.    On this date, surveillance units established a surveillance perimeter both in the area of the Riviera Motel as well as Target Premises #1. Investigators observed GRANGER standing outside of Target Premises #1. Later in the afternoon, CAHILL was observed exiting Target Premises #1 and entering Target Vehicle #1. Investigators watched CAHILL drive directly to the

Riviera Motel and enter the parking lot. URRUTIA approached Target Vehicle #1 and entered the front passenger seat. After several minutes, URRUTIA exited Target Vehicle #1, and CAHILL subsequently left.

29.     Shortly afterwards, NHMOTF investigators met CW-1 at a PDL. CW-1 was searched for contraband, controlled substances, weapons, and unexplained amounts of currency with negative findings. CW-1 was provided a surreptitious audio/video recording device, an audio transmitter, and $600.00 in OAF. CW-1 subsequently departed from the PDL on foot and was observed walking to the Riviera Motel while under constant physical surveillance. CW-1 arrived to URRUTIA's motel room, #118, and was allowed inside. Once CW-1 entered the motel room, investigators could hear CW-1 interacting with a male who, by this point, was recognized to be URRUTIA based on previous controlled purchases and reviews of audio recordings. The GPS locator of the audio transmitter also confirmed that CW-1 was inside the Riviera Motel. After a few minutes, CW-1 was observed exiting the motel room and walking back to the PDL while under constant surveillance. CW-1 reunited with the handling agents, at which point they relinquished two plastic bags containing a white crystal like substance consistent with the appearance and packaging of methamphetamine.

30.     CW-1 was transported by investigators to a different location to conduct a debrief. CW-1 was searched for weapons, contraband, controlled substances, and unexplained currency, with none found. CW-1 stated that they arrived to URRUTIA's motel room, knocked on the door, and was greeted by URRUTIA. CW-1 provided URRUTIA the $600. URRUTIA laid out the cash on the bed in stacks of $100, then opened the top drawer of his nightstand and grabbed two plastic bags containing the suspected methamphetamine. CW-1 did not see anything else in the drawer. CW-1 then left the motel room and walked back to the PDL to reunite with the handling agents.

31.     The audio/video recording corroborated the account of events debriefed by CW-1. Investigators again positively identified URRUTIA as the male who sold CW-1 the suspected methamphetamine. The drugs weighed approximately 43.10 grams unpackaged, and tested positive for methamphetamine with a TruNarc Narcotics Detection Device.  The laboratory results confirmed that the substance was 41.8 grams of methamphetamine hydrochloride.

32.     September 20, 2023 Buy: On this date, NHMOTF investigators completed a controlled purchase of narcotics from URRUTIA, utilizing CW-1. Since the last controlled purchase, URRUTIA had moved to Target Premises #2, Rochester Residence Inn, room #9, located at 182 Milton Rd, Rochester, New Hampshire. At the direction of law enforcement, CW-1 had previously organized a narcotics transaction with URRUTIA to purchase approximately two ounces of methamphetamine for $1200.00. CW-1 arranged the transaction with URRUTIA via phone calls and text messages at the phone number 603-953-8508.

33.     Investigators met CW-1 at a PDL, where they searched CW-1 for weapons, contraband, controlled substances, and unexplained amounts of currency with negative results. CW-1 was equipped with a surreptitious audio/video recording device, an audio transmitter, and was provided $1200.00 in serialized currency of OAF. At the direction of law enforcement, CW-1 placed a recorded phone call to URRUTIA and asked if he was ready. URRUTIA answered "Wait she's on her way," and then followed up with "Be here like 15, 20 minutes." Surveillance units previously established a surveillance perimeter in the area of Target Premises #2 and Target Premises #1. CAHILL was observed leaving Target Premises #1 in Target Vehicle #1, and was followed by surveillance to the Rochester Residence Inn. After several minutes, URRUTIA called CW-1 back and stated, "Head over now."

34.     Handling agents transported CW-1 to a secondary PDL, where CW-1 departed on foot to proceed to the Rochester Residence Inn while under direct and uninterrupted surveillance. Initially, CW-1 arrived to an incorrect room, and was redirected by an uninvolved female to Target Premises #2, which was on the rear side of the motel building accessed by a dirt road. CW-1 walked on foot around the motel building and subsequently arrived to Target Premises #2. CW-1 then could be heard speaking to a male voice, believed to be URRUTIA's based on previous recordings of controlled purchases. The GPS locator also confirmed the location of CW-1, which changed initially from the front of the motel building, to then the backside after they were redirected to Target Premises #2. Shortly after CW-1's arrival to Target Premises #2, CAHILL was observed leaving the rear of the motel in Target Vehicle #1, and proceeding south on Milton Road. Soon after, CW-1 left Target Premises #2 and ultimately reunited with the investigators at the PDL. CW-1 then relinquished one plastic bag containing a clear crystal like substance, consistent with the appearance and packaging of methamphetamine.

35.     Investigators transported CW-1 to a different location to complete a debrief. CW-1 was searched for weapons, contraband, controlled substances, and unexplained currency, with none found. CW-1 reported that they initially arrived to an incorrect room number, room #7, and was redirected by an uninvolved female to room #9, located in the rear of the motel. CW-1 walked around the building and arrived to URRUTIA's room. CW-1 observed the black BMW parked near the motel room, and recognized the female in the driver seat to be "Haley." URRUTIA was seated in the passenger seat of the BMW. URRUTIA exited the passenger seat of CAHILL's car and called out to CW-1 to stand by the door of his motel room. URRUTIA then returned to his motel room, went inside, secured his dogs, and instructed CW-1 to come inside. CW-1 provided URRUTIA the money, at which point URRUTIA took out a plastic bag containing the suspected

methamphetamine from his pocket and handed it to CW-1. URRUTIA counted the cash in front

of them, and had the drugs already weighed out and packaged. CW-1 advised there was no one

else inside the motel room. CW-1 then left the motel room and returned to the handling agents on

foot.

36.     The audio/video recording corroborated CW-1's debrief, and URRUTIA was

positively identified by investigators. The drugs weighed approximately 59.30 grams unpackaged,

and tested positive for methamphetamine with the TruNarc Narcotics Detection Device.

37.     October 3, 2023 Buy:     On this date, NHMOTF investigators conducted a

controlled purchase of narcotics from GRANGER, utilizing CW-2. Investigators met with CW-2

at a PDL and searched them for weapons, controlled substances, contraband, and unexplained

currency with none found. At the direction of law enforcement, CW-2 was instructed to organize

a deal with GRANGER for the purchase of approximately three ounces of methamphetamine via

a recorded phone call to 520-274-0273. CW-2 confirmed this was the number they used to reach

out to GRANGER for historic drug transactions. During the recorded call, GRANGER confronted

CW-2 that they owed him money and that CW-2 was in debt. Both parties discussed drug pricing

for several minutes. GRANGER then informed CW-2 that he would have to check how much "T"[3]

he had, and that he would need to call CW-2 back. Surveillance units had already established a

surveillance perimeter outside of Target Premises #1. During this phone call between GRANGER

and CW-2, surveillance observed GRANGER on the phone while standing in the yard of Target

Premises #1. GRANGER was then observed re-entering Target Premises #1.

38.     GRANGER called CW-2 back to advise that he was all set, and would meet CW-2

soon. Shortly after, surveillance units observed GRANGER and a white male leave Target

---

[3] Based on my training and experience, I know that "T" was short for "Tina," a common slang
term for methamphetamine.

Premises #1 and enter GRANGER'S registered vehicle, Target Vehicle #2. CW-2 was provided with a surreptitious audio/video recording device, an audio transmitter, and $2,000.00 in serialized currency of OAF for the purpose of purchasing narcotics. CW-2 deployed from the PDL on foot to wait for GRANGER at the intersection of Central Avenue and Hanson Street in Rochester, New Hampshire. Upon GRANGER's arrival, CW-2 entered the rear passenger seat of Target Vehicle #2. While under direct and uninterrupted physical surveillance, GRANGER drove to 5 Heaton Street in Rochester, where he dropped off the other male. During this time, CW-2 could be heard over the audio transmitter interacting with male voices. GRANGER subsequently returned to the intersection of Central Avenue and Hanson Street, at which point CW-2 departed from the vehicle and returned to the PDL on foot to reunite with the handling agents.

39.     CW-2 relinquished to investigators two plastic baggies containing a white crystal like substance, consistent with the appearance and packaging of methamphetamine. CW-2 was again searched for weapons, contraband, controlled substances, and unexplained currency with none found. Investigators and CW-2 conducted a debrief of the narcotics transaction. CW-2 reported that they left the PDL and walked over to Hanson Street. GRANGER called CW-2 to ask where they were, and stated they would be there shortly. GRANGER pulled up and instructed CW-2 to get in the back seat. CW-2 entered Target Vehicle #2, and confirmed that GRANGER was driving. At this time, CW-2 did not know the male in the front passenger seat. GRANGER proceeded to drive. During the drive, CW-2 handed the money to GRANGER, at which point GRANGER took out the two plastic bags with suspected methamphetamine from his pants. The drugs had already been packaged and weighed out. GRANGER proceeded to Heaton Street to drop off the other male. CW-2 then got into the front passenger seat of the Infiniti. GRANGER then counted the cash in front of them to confirm the amount. GRANGER subsequently drove CW-2

back to the location where they were originally picked up. Once GRANGER drove off, CW-2 returned to the handling agents on foot at the PDL.

40.     Investigators reviewed the audio/video recording, which corroborated what surveillance units observed as well as what CW-2 reported during the debrief. The video captured CW-2 handing the cash to GRANGER while in the vehicle. Investigators positively identified GRANGER as the involved party in the transaction and as the driver of Target Vehicle #2. The drugs were later weighed to be approximately 86.85 grams unpackaged and tested positive for methamphetamine with a TruNarc Narcotics Detection Device.

41.     October 6, 2023 Buy: On this date, NHMOTF investigators conducted a controlled purchase of narcotics from GRANGER utilizing CW-2. Investigators met with CW-2 at a PDL. CW-2 was searched for weapons, contraband, controlled substances, and unexplained currency with none found. CW-2 was provided a surreptitious audio and video recording device, an audio transmitter, and $2,000.00 in serialized currency of OAF. At the direction of law enforcement, CW-2 placed a recorded phone call to GRANGER, at his phone number of 520-274-0273, to organize the purchase of approximately three ounces of methamphetamine for $2,000.00. During the phone call, GRANGER indicated that he had the drugs and agreed to meet CW-2 after he was done eating.

42.     CW-2 deployed from the PDL on foot and waited for GRANGER to arrive at the intersection of Central Ave and Hanson Street. Surveillance units had established a surveillance perimeter around Target Premises #1 and confirmed that both Target Vehicle #1 and Target Vehicle #2 were parked at the residence. CW-2 was observed taking a phone call, and soon after began walking in the direction of Target Premises #1 via Portland Street and Charles Street. CW-2 was under constant and uninterrupted surveillance. Before CW-2 reached Target Premises #1,

GRANGER was observed reversing out of the driveway of Target Premises #1 while driving Target Vehicle #2, and proceeding onto Charles Street in the direction of CW-2. GRANGER pulled over and allowed CW-2 to enter Target Vehicle #2's front passenger seat. Over the next several minutes, GRANGER drove them around throughout the downtown Rochester area, traveling down numerous side streets, but never stopping anywhere. Eventually, GRANGER arrived to the intersection of Hanson Street and Central Street, at which point CW-2 exited Target Vehicle #2 and returned to the PDL on foot to reunite with the handling agents. GRANGER was observed returning to Target Residence #1, parking in the driveway, exiting the vehicle, and walking in the direction of the rear entrance.

43.     CW-2 relinquished one plastic bag containing a white crystal like substance, consistent with the appearance and packaging of methamphetamine. CW-2 was searched for weapons, controlled substances, contraband, and unexplained currency, with none found. Investigators and CW-2 then debriefed the controlled purchase. CW-2 reported that after originally deploying from the PDL, they waited for GRANGER's arrival near the intersection of Hanson Street and Central Avenue. Because GRANGER was taking a long time, CW-2 called him to check in. GRANGER instructed CW-2 to start walking in his direction. CW-2 began to walk in the direction of Target Premises #1. CW-2 was walking on Charles Street when they noticed GRANGER driving to their location and pulling over. CW-2 entered Target Vehicle #2, and the two of them drove around Rochester while completing the narcotics transaction. CW-2 reported that soon after entering Target Premises #2, they handed the money to GRANGER. GRANGER counted the money while in transit, then pulled out a bag of suspected methamphetamine from inside his pants and handed it to CW-2. GRANGER then dropped CW-2 off at the intersection of

Central Avenue and Hanson Street and drove away. CW-2 then walked back to the PDL to reunite with the handling agents.

44.     Investigators reviewed the audio/video recording, which corroborated the events that CW-2 reported. GRANGER was again positively identified in the video recording. The drugs weighed approximately 86.5 grams unpackaged, and tested positive for methamphetamine with the TruNarc Narcotics Detection Device.

45.     October 12, 2023 Buy: On this date, NHMOTF investigators conducted two controlled purchases of narcotics. During the first controlled purchase, NHMOTF utilized CW-2 to buy methamphetamine from GRANGER. Surveillance units established a surveillance perimeter in the area of Target Premises #1. Investigators met with CW-2 at a PDL and searched CW-2 for weapons, controlled substances, contraband, and unexplained currency with negative results. At the direction of law enforcement, CW-2 had previously organized the purchase of approximately four ounces of methamphetamine from GRANGER for $2,100.00, via phone calls to GRANGER'S phone number, 520-274-0273. While with investigators, CW-2 placed another phone call into GRANGER at the same number to confirm he was ready. Investigators then provided CW-2 with a surreptitious audio/video recording device, an audio transmitter, and $2,100.00 in serialized currency of OAF. CW-2 subsequently deployed on foot and began walking to Target Premises #1 while under constant and uninterrupted surveillance.

46.     Surveillance observed GRANGER exit Target Premises #1 and enter Target Vehicle #2. GRANGER then drove Target Vehicle #2 to the intersection of South Main Street and Portland Avenue in Rochester and picked CW-2 up. GRANGER proceeded to drive around Rochester and eventually dropped CW-2 off on Hanson Street. GRANGER continued to drive around but ultimately returned to Target Premises #1. CW-2 reunited with the handling agents and

relinquished one clear baggie containing a clear crystal-like substance consistent with the appearance and packaging of methamphetamine. CW-2 was subsequently searched for weapons, contraband, controlled substances, and unexplained currency with none found.

47.     Investigators and CW-2 debriefed the controlled purchase. CW-2 reported that they departed the PDL and began walking in the direction of GRANGER's residence. GRANGER picked CW-2 up at the intersection of South Main Street and Portland Avenue, and the two of them began to drive around the area. At one point, CW-2 began to hand over the cash to GRANGER, but GRANGER instructed them to hold it lower so that people did not see. CW-2 placed the cash on the console and GRANGER counted it. GRANGER then removed a clear baggie of the suspected methamphetamine from the crotch area of his pants and handed it to CW-2. CW-2 attempted to place the drugs in their pocket, but GRANGER instructed them to stuff it down the front of their pants. CW-2 reported that GRANGER continued to drive around and was law enforcement surveillance conscious. CW-2 reported they were eventually dropped off on Hanson Street. Once GRANGER was out of the area, CW-2 reunited with the agents.

48.     Investigators reviewed the audio/video recording, and positively identified GRANGER in the video. The footage corroborated what CW-2 reported to investigators during the debrief. The drugs were later processed at a secure FBI facility, weighed to be approximately 114.25 grams unpackaged, and tested positive for methamphetamine with a TruNarc Narcotics Detection Device.

49.     Simultaneously with this controlled purchase, investigators conducted another controlled purchase of narcotics from URRUTIA, utilizing CW-1. At the direction of law enforcement, CW-1 had previously organized the purchase of approximately one ounce of

methamphetamine from URRUTIA for $700.00. CW-1 organized this deal via text messages and a phone call to URRUTIA at his current phone number 603-953-8508.

50.     Investigators met with CW-1 at a PDL. CW-1 was searched for weapons, contraband, controlled substances, and unexplained currency with none found. Surveillance units had already established a surveillance perimeter around Target Premises #1 as well as Target Premises #2. At the direction of law enforcement, CW-1 placed a recorded phone call to URRUTIA, at the same phone number 603-953-8508, and asked if they were okay to arrive. URRUTIA answered "No she's coming at 12:30." Around this time, surveillance units observed CAHILL departing Target Premises #1 in Target Vehicle #1, arriving to the rear of the Rochester Residence Inn motel, and parking in the area of Target Premises #2.

51.     Shortly after, CW-1 received both a phone call as well as a text message from URRUTIA to advise he was ready. CW-1 was equipped with a surreptitious audio/video recorder and an audio transmitter and was provided with $700.00 in serialized currency of OAF. Investigators then drove CW-1 to a secondary PDL, an area closer to the motel, at which point CW-1 deployed on foot in the direction of the motel.

52.     CW-1 walked to the rear of the motel and approached Target Premises #2. Within that time-period, URRUTIA was observed by surveillance exiting Target Premises #2 and approaching Target Vehicle #1 twice. Upon arrival to Target Premises #2, both CW-1 and URRUTIA went inside. Shortly after, CW-1 exited Target Premises #2 and walked back in the direction of the PDL while under constant and uninterrupted physical surveillance. URRUTIA also exited Target Premises #2 and re-approached Target Vehicle #1. Within a couple of minutes, Target Vehicle #1 drove out of the rear motel parking lot, and headed southbound on Milton Street.

CAHILL was eventually observed returning to Target Premises #1 and parking Target Vehicle #1 in the driveway.

53.     CW-1 reunited with the handling agents and relinquished one plastic bag containing a crystal like substance consistent with the appearance and packaging of methamphetamine. CW-1 was transported back to the original PDL, at which point they were searched for weapons, contraband, controlled substances, and unexplained currency with negative results. CW-1 and investigators debriefed the controlled purchase. CW-1 reported that they departed from the secondary PDL and approached the rear of the motel. CW-1 observed URRUTIA standing by the driver side of CAHILL's car. CW-1 recognized the vehicle to be the same from the numerous previous controlled purchases, and recognized "Haley" as the sole occupant. URRUTIA instructed CW-1 to enter the motel room. CW-1 went inside, and URRUTIA followed. URRUTIA took the cash from CW-1 and counted it. URRUTIA then removed one bag with suspected methamphetamine from inside his pants pocket, along with a second plastic baggie that was possibly empty, which he placed into a top kitchen drawer. URRUTIA then handed CW-1 the bag of suspected methamphetamine to complete the transaction. CW-1 exited the motel room and noticed that the female was still outside, seated in her car. CW-1 proceeded to walk back to the handling agents, and shortly after noticed the female driving past him and leaving the area.

54.     Investigators reviewed the audio/video recording, which corroborated CW-1's account of the operation during the debrief. Investigators recognized the male in the video to be URRUTIA. The video also captured Target Vehicle #1 parked outside. The drugs were later processed at a secure FBI facility, weighed approximately 31.20 grams unpackaged, and tested positive for methamphetamine with a TruNarc Narcotics Detection Device.

55.    October 23, 2023 Buy:   On this date, NHMOTF members conducted a controlled purchase of narcotics from GRANGER, utilizing CW-2. Investigators met with CW-2 at a PDL, and searched them for weapons, contraband, and unexplained currency, with none found. CW-2 was equipped with a surreptitious audio/video recording device, an audio transmitter, and was provided $2,000.00 in OAF for the purchase of methamphetamine. At the direction of law enforcement, CW-2 placed a recorded call to GRANGER, at his phone number of 520-274-0273, to advise their current location and arrange a narcotics transaction. GRANGER agreed to drive to their location and pick-up CW-2. CW-2 departed the PDL and stood by Holy Rosary Credit Union, located at 133 Brock St, Rochester, while under constant surveillance.

56.    GRANGER arrived to the location in Target Vehicle #2, and picked up CW-2. Surveillance followed GRANGER until he arrived at Target Premises #1 and parked in the driveway. GRANGER exited his vehicle and entered Target Premises #1 through the rear sliding glass door entrance. CW-2 remained in the passenger seat of the car. Shortly after, GRANGER returned to his vehicle, entered the driver seat, and departed Target Premises #1. Surveillance followed GRANGER until he arrived to the area of Hanson Street and dropped CW-2 off. GRANGER drove away from the area and returned to Target Premises #1. CW-2 and handling agents reunited and debriefed the event. CW-2 was searched for weapons, contraband, and unexplained currency with none found.

57.    CW-2 reported that after departing on foot from the PDL, they waited for GRANGER to arrive to the Holy Rosary Credit Union. GRANGER arrived in his Infiniti, and CW-2 entered the front passenger seat. During the drive, CW-2 handed GRANGER the $2,000.00. GRANGER drove them directly to his house and parked in his driveway. GRANGER took the cash and entered his home apartment through the sliding glass door. GRANGER eventually exited

his home through the same door, entered the Infiniti where CW-2 was still seated, and departed. GRANGER then drove directly to Hanson Street to drop CW-2 off. CW-2 asked for the "ice." "Ice" is a street term for methamphetamine. GRANGER answered that he did not have it at this time, and would need to go get it. GRANGER set up a time to meet up with CW-2 later this afternoon, around noon. After GRANGER drove away, CW-2 reunited with the handling agents.

58.    At the direction of law enforcement, CW-2 placed an additional three recorded phone calls to GRANGER between 11:44 AM and 1:55 PM for status updates on the drugs. GRANGER answered that he was not ready, and that he was waiting for his supplier to wake up. At approximately 2:14 PM, CW-2 received an incoming call from phone number 603-842-3348. The male on the line stated that he had the narcotics that CW-2 was looking for. CW-2 answered that they only wanted to deal with "Monty." The male responded, "I got it for him right now cuz he's not around." CW-2 and the male ended the call. CW-2 reported to investigators that they had met the male attached to this phone number, and knew him to be "Eddie." CW-2 stated that "Eddie" was in fact the male who was originally present in GRANGER's vehicle as the front passenger during the first controlled purchase operation, on 10/03/2023. CW-2 explained that while he did not recognize "Eddie" during that prior controlled purchase operation due to his positioning in the vehicle and his focus on Granger, he was familiar with him and his phone number.   CW-2 described the male to be white, scruffy, and typically wore eyeglasses. Through open source and law enforcement databases, agents identified this male to be EDWARD DEAL. At the direction of law enforcement, CW-2 called the number back and asked if GRANGER had directed him to reach out to CW-2. The male answered, "He sent me your number and told me to

hit you up that you needed something." The male then stated that he had "2 zips,"[4] and that he would send "his girl" to meet CW-2 on Winter St.

59.     Investigators again equipped CW-2 with a surreptitious audio/recording equipment and an audio transmitter. CW-2 then departed the PDL on foot and walked directly towards Winter Street while under constant physical surveillance. CW-2 proceeded northbound on Winter Street on the sidewalk until they were met by a female who was walking southbound on Winter Street. After a brief interaction, both parties separated into opposite directions. CW-2 then walked back in the direction of the handling agents until they were reunited. Based on booking photographs and prior police contacts, the female was positively identified as MICHELLE FREDETTE-CHATMAN.

60.     CW-2 relinquished a plastic bag containing a crystal like substance consistent with the appearance and packaging of methamphetamine. CW-2 reported that after departing from the PDL, they began walking down Winter St. CW-2 approached a female who asked if they were there for "Eddie."   CW-2 confirmed, at which point the female reached into CW-2's pocket and placed the drugs there. CW-2 thanked the female and the two parties separated. CW-2 then walked directly to back to reunite with the handling agents. CW-2 was again searched for weapons, contraband, and unexplained amount of currency with none found.

61.     Investigators reviewed the audio/video recordings, which corroborated what CW-2 reported during their debriefs and what surveillance observed. In the recording during which CW-2 was inside GRANGER's vehicle, the video captured them pulling into the driveway to Target Premises #1. During the recording, CAHILL's vehicle, Target Vehicle #1, was observed parked directly in front. When GRANGER exited his residence, the video recording captured

---

[4] "Zip" is a street term for an ounce of methamphetamine.

GRANGER walking through the gate of the white fence that encompassed his rear deck. When GRANGER dropped CW-2 off on Hanson Street, the audio confirmed that CW-2 requested 2 ounces of methamphetamine and GRANGER answered he needed to go get it. In the recording of the deal involving FREDETTE-CHATMAN, the audio portion captured her asking CW-2 something to effect of them meeting "Eddie." After a brief interaction, CW-2 was heard thanking her, and she answered, "You're very welcome."

62.    Investigators again reviewed audio/video footage from the controlled purchase on 10/03/2023 from GRANGER. When CW-2 was seated in the rear passenger seat of Target Vehicle #2, the video footage captured the male from the rear vantage point, who appeared to be a white male with eyeglasses. This appearance corroborated CW-2's description of "Eddie."

63.    The suspected methamphetamine was later processed at a secure FBI facility. The drugs weighed approximately 61.1 grams unpackaged and tested positive for methamphetamine with a TruNarc Narcotics Detection Device.

64.    October 23, 2023 Buy:   Later on this same date, NHMOTF members conducted a controlled purchase of narcotics from URRUTIA, utilizing CW-1. At the direction of law enforcement, CW-1 had previously organized the purchase of approximately four ounces of methamphetamine for $2,000.00 via phone calls and text messages to URRUTIA's present phone number, 603-953-8508. Surveillance units had already established a surveillance perimeter around Target Premises #1 and Target Premises #2. At 1:08 PM, surveillance observed CAHILL depart from Target Premises #1 in Target Vehicle #1, and was followed until she arrived at the Rochester Residence Inn, the location of Target Premises #2. Surveillance observed CAHILL drive down the dirt path that leads to the rear of the motel at approximately 1:26 PM and park. At 1:28 PM,

CAHILL was observed departing. Surveillance did not follow CAHILL after she departed URRUTIA's motel.

65.     Later this day, at approximately 4:20 PM, investigators met with CW-1 at a PDL, at which point they were searched for weapons, contraband, and unexplained amount of currency with none found. At this time, CAHILL's vehicle, Target Vehicle #1, was parked in the driveway of Target Premises #1. CW-1 showed to investigators the text messages between them and URRUTIA at the phone number 603-953-8508. During the previous day, on 10/22/2023, URRUTIA texted CW-1 "What do you want? 4 ounces of Tina," and then texted "Its 2000 f 4 Oz." Based on their training and experience, investigators knew that the message indicated the narcotics deal was going to be $2,000.00 for four ounces of methamphetamine. Investigators equipped CW-1 with a surreptitious audio/video recorder, an audio transmitter, and was provided with $2,000.00 in OAF.

66.     CW-1 departed from the PDL on foot and walked directly to Target Premises #2 while under constant physical surveillance. Investigators then could hear CW-1 interacting with a male voice over the audio transmitter, and the GPS function placed their location inside the motel. Shortly after, CW-1 departed from Target Premises #2 and returned to the handling agents while under constant visual contact. Once reunited with investigators, CW-1 relinquished a plastic bag containing four smaller plastic knotted bags, each containing a crystal like substance consistent with the appearance and packaging of methamphetamine.

67.     CW-1 was again searched for weapons, contraband, and unexplained currency with none found. Investigators and CW-1 then debriefed the controlled purchase. CW-1 reported that after departing from the PDL, they walked directly to URRUTIA's motel room. CW-1 tapped on the door and was greeted by URRUTIA. The two of them entered the motel room, and URRUTIA

retrieved a plastic bag containing the already weighed and pre-packaged drugs out from the top drawer of a set of kitchen drawers. URRUTIA took CW-1's money and counted the cash. URRUTIA informed CW-1 that he also had "Soft" and "Hard."[5]

68.     Investigators reviewed the audio/video recording, which corroborated what CW-1 reported during the debrief. The recording captured URRUTIA's face, which allowed investigators to positively identify him. The audio portion of the recording also captured the counting of the cash. The suspected methamphetamine was later processed at a secure FBI facility, which weighed approximately 119.05 grams unpackaged, and tested positive for methamphetamine with a TruNarc Narcotics Detection Device.

69.     On November 2, 2023, investigators executed a search warrant at Target Premises #1.   While present, investigators observed a gray, two door shed on the curtilage.   Upon speaking with the occupants of 18 Copeland Drive, Unit B, investigators learned that each unit had access to a separate side of the shed.   If looking at the front of the shed, the shed section associated with Target Premises #1 is the door on the left-hand side, while the shed section associated with 18 Copeland Drive, Unit B is the door on the right-hand side.   The occupants of Unit B stated that Granger uses his section of the shed.   Investigators, in looking through the shed's window associated with Target Premises #1, observed dog cages.   During the search of Target Premises #1, investigators located multiple dogs.

70.     Based on the foregoing and my training and experience, I believe that CAHILL and GRANGER store drugs at Target Premises #1.   As the shed associated with Target Premises #1, as described in Attachment A, appears to be used by Granger and Cahill and is on the curtilage of

---

[5] I know through my training and experience that "Soft" is street vernacular for powder cocaine, and "Hard" is street vernacular for crack cocaine. CW-1 exited the motel room and returned to the handling agents.

18 Copeland Drive, I believe there is probable cause to believe that evidence of the Target Offenses will be located in the shed.

### Training and Experience Concerning Items to be Seized

71.     Based upon my training and experience, as well as the collective knowledge and experience of other agents and police officers in my office, I am aware that drug traffickers very often store controlled substances, firearms, and other tools of the drug trade in their homes, hotel rooms, automobiles, garages or outbuildings on their properties, basements, or other places under their immediate control. I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug related paraphernalia including, but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other locations they access with frequency.

72.     It is generally a common practice for drug traffickers to maintain in hard copy or on other electronic devices, records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such recordkeeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.

73.     Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories,

check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

74.     Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

75.     It is also a generally common practice for traffickers to conceal at their residences, or other places they access frequently, large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators. They may also use shipping companies and keep

records of shipments of goods bought with drug proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. I know that drug traffickers sometimes purchase real estate with suspected drug proceeds. They may keep records of real estate transactions, money received from rental properties, and other such documents in their residences.

76.     Based on my training and experience, I know that individuals involved in the distribution of controlled substances attempt to hide the true identity of their residence and, further, employ methods of surveillance at such residence in order to evade law enforcement. Typically, these individuals will maintain at their residence documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. I know that drug traffickers often use storage units to store drug proceeds and that keys or records of these units may be kept in residences.

77.     Often, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

78.     Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. I am aware that items such as cell phones and U.S. currency are often located in a residence or on an individual's person.

79.     Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

80.     It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

81.     I know that individuals who distribute narcotics often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution. I also know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to potential drug purchasers.

**Training and Experience on Digital Devices**

82.     In addition to documentary evidence of financial and drug trafficking crimes, I know based on my training and experience that drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses, and other locations accessed by them. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. I am aware that collections of cell phones

have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

83.     As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from most cell phones. I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like Whatsapp, Textnow, Signal, Facebook Messenger, and Instagram, to communicate with people in other countries (often countries from where drugs are brought into the United States) and with people who are most cautious about law enforcement detection. Other applications like Venmo or Cashapp allow people to quickly make financial transfers to others and drug customers may use these methods to pay their sources of supply for drugs.

84.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range

and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

85.    As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

   a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

   b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.  The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.  Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have

been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the

computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment and can require substantial time. Other than what has been described herein, to my

knowledge, the United States has not attempted to obtain this data by other means.

86.     Based on my training and experience, I believe that it is likely that the Target Premises and Target Vehicles will contain smartphones that can be unlocked via the use of a fingerprint or facial recognition in lieu of a numeric or alphanumeric password. I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint or facial recognition in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID or facial recognition.

87.     If a user enables Touch ID or facial recognition on a given device, he or she can register numerous fingerprints or facial profiles that can be used to unlock that device. The user can then use any of the registered fingerprints or facial profiles to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor or by looking into the device's camera. In my training and experience, users of Apple devices that offer Touch ID or facial recognition often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

88.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID or facial recognition enabled, and a passcode must be used instead, such as: (1) when a certain amount of time has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID or facial recognition recently and the passcode or

password has not been entered in the last few days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID or facial recognition exists only for a short time.

89.     Although Apple's Touch ID or facial recognition may be the most common or well-known means for unlocking a device with a fingerprint or facial profile, I am aware that other brands of smartphones like Samsung also offer similar features that work essentially in the same way. Therefore, when I refer to Touch ID or facial recognition I am not just referring to Apple devices, but to similar technology on all smartphones. While I believe that the targets of this investigation likely use smartphones, I am not aware of the particular brand of phone that they use.

90.     The passcodes that would unlock the targets' devices is not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's Touch ID sensor or put the device's camera in front of the user's face in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock devices with the use of the fingerprints or facial profile of the user is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

## **CONCLUSION**

91.     For all the reasons described above, I submit that there is probable cause to believe that evidence and fruits of the violations of 21 U.S.C. § 841(a)(1) and 846 [Distribution of Controlled Substances and Possession with Intent to Distribute Controlled Substances, Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances] will be found by searching the shed located on the premises of 18 Copeland Drive, Rochester, New Hampshire, associated with Apartment A, as further described in Attachment A.   Based upon my training and

experience I believe that the items set forth in Attachment B are commonly possessed by drug traffickers in their homes, on their cell phones, or in other places under their control and that those items are evidence of violations of the offenses being committed by GRANGER, CAHILL, and URRUTIA.

/s/ Dennis Elbert
Dennis Elbert, Task Force Officer
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **11:53 AM, Nov 2, 2023**
Time: **Nov 2, 2023**

UNITED STATES MAGISTRATE JUDGE
**Andrea K. Johnstone**

**ATTACHMENT A**
**<u>Premises to be Searched</u>**

**Shed located on the premises of 18 Copeland Drive, Rochester, New Hampshire, associated with Apartment A:** 18 Copeland Drive is a duplex style apartment building, consistent of Unit A and Unit B. Located on the property is a one story, two-door gray shed with windows.   The shed is surrounded by a metal fence with a gated entryway accessible by the driveway of 18 Copeland Drive. If looking at the front of the shed, the shed section associated with Apartment A is the door on the left-hand side.





**ATTACHMENT B**
**Items to be Seized**

1.      Controlled substances including fentanyl and methamphetamine;

2.      Drug distribution paraphernalia including: scales, plastic baggies, wrapping material,
        paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3.      Devices used to communicate with other drug traffickers or buyers including cellular
        telephones and pagers believed to be used by Monty Granger and Haley Cahill, and
        electronic equipment used for counter-surveillance such as scanners, police radios or
        monitors;

4.      Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller
        lists, ledgers, records of sales, records of expenditures made to purchase drugs or
        chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, and
        address books;

5.      Large amounts of currency (exceeding $500) or readily transported assets which are used
        as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels,
        etc.); prepaid debit cards and gift cards;

6.      Materials evidencing expenditure of drug trafficking proceeds including, purchase of
        large assets, including digital image storage devices, records of real estate or securities
        transactions, escrow files, wire transfer records, automobiles, motorcycles, trucks, or
        other vehicles purchased with cash or cash equivalents; credit and debit card records,
        including records of purchases, withdrawals, deposits and cash advances made with
        credit and debit cards, and including statements and receipts;

7.      Photographs, negatives, video tapes, films, depicting the subjects of the investigation and
        their criminal associates, (showing association with the associates, depicting their assets
        or depicting controlled dangerous substances);

8.      Personal calendars, address and/or telephone books, rolodex indices and papers reflecting
        names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers,
        correspondences of the subjects of the investigation and their criminal associates, sources
        of supply, customers, financial institutions, and other individuals or businesses with
        whom a financial relationship exists;

9.      Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive
        devices, etc., in which there is no immediate appearance of legitimate use and of which
        may be used in conjunction with the distribution of controlled substances;

10.     Indicia of possession of the place to be searched: including articles of personal property,
        such as personal identification, immigration documents, personal correspondence,
        delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts,

personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

11.   Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning Monty Granger and Haley Cahill, business entities in which they are stakeholders, or co-conspirators; and

12.   Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

13.   For the cellular telephones used primarily by MONTY GRANGER and HALEY CAHIL, , I seek to search the telephones for the following information from the time period of October 1, 2022 through the present:

   a.   Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

   b.   lists of customers and related identifying information;

   c.   types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

   d.   any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

   e.   any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   f.   information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

   g.   all bank records, checks, credit card bills, account information, and other financial records (including on financial applications like CashApp and Venmo);

   h.   Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

During the execution of the search of the shed associated with 18 Copeland Drive,

Apartment A, Rochester as described in Attachment A, law enforcement personnel are

authorized to press the fingers (including thumbs) of MONTY GRANGER and HALEY CAHILL, if found at the property, to the fingerprint sensor of the devices respectively believed to be used by them for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. Compelling the unlocking of the devices using facial recognition is also permitted.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.